# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

JULANDA DANIELS,                          )
                                          )
        Plaintiff,                        )
                                          )          No. 09 C 2252
vs.                                       )
                                          )          Magistrate Judge Schenkier
MICHAEL J. ASTRUE, Commissioner of        )
Social Security,                          )
                                          )
        Defendant.                        )

## MEMORANDUM OPINION AND ORDER[1]

The plaintiff, Julanda Daniels, seeks judicial review of a final decision by the Commissioner

("Commissioner") of the Social Security Administration ("SSA"), who denied her application for

Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") pursuant to the

Social Security Act (the "Act"), 42 U.S.C. § 405(g). Ms. Daniels seeks to reverse the

Commissioner's final decision denying her claim for SSI and DIB or, in the alternative, to remand

her case for further review (doc. # 30). The SSA filed a motion seeking a judgment that affirms the

Commissioner's denial of benefits (doc. # 34). For the reasons stated below, the Court denies the

SSA's request to affirm, and grants Ms. Daniels' motion to remand.

### I.

We begin with the procedural history of this case. On February 2, 2006, Ms. Daniels filed

a Title II application for SSI and a Title XVI application for DIB (R. 9).[2] In both applications, Ms.

---

[1]On December 11, 2009, by the consent of all parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to this Court for all proceedings, including entry of final judgment (doc. ## 19, 22).

[2]The original application is not in the record. Therefore, we rely on the ALJ's decision for this fact.

Daniels claimed a disability onset date of January 19, 2006 (*Id.*). The SSA denied both applications

on April 28, 2006, as well as on reconsideration on August 23, 2006 (R. 60-63; 68-69). Ms. Daniels

then requested and received an administrative hearing, held before an Administrative Law Judge (the

"ALJ") on April 8, 2008, in Orland Park, Illinois (R. 20-54). Prior to the hearing, Ms. Daniels

received written notice and was notified on the record that she had the right to be represented by an

attorney at the hearing; however, Ms. Daniels chose to proceed without representation (R. 20-21).

On November 4, 2008, the ALJ issued a decision finding that Ms. Daniels was not considered

disabled under the Act (R. 9-17), because her impairments or combination of impairments did not

"meet or medically equal the requirements of any listed impairment in Appendix 1, Subpart P,

Regulations No. 4" (R. 12). The Appeals Council denied review on February 19, 2009, thus making

the ALJ's decision the final decision of the Commissioner (R. 1). Ms. Daniels filed a timely

complaint in this Court for administrative review.

## II.

We now summarize the administrative record. We set forth general background evidence

concerning Ms. Daniels' history and medical complaints in Part A, followed by the medical record

in Part B. We then discuss the hearing testimony in Part C, and we address the ALJ's written

opinion in Part D.

## A.

Ms. Daniels was born on November 27, 1971. Ms. Daniels is single and resides in Joliet,

Illinois with her four children, one of whom is disabled (R. 20, 25, 35-36, 141). In 1988, Ms.

Daniels completed the eleventh grade and later received a GED (R. 26, 121). Over the years, Ms.

2

Daniels has become certified as a phlebotomist,[3] a medical assistant, and a certified nursing assistant (R. 27, 121-122).

Beginning in March 1990, Ms. Daniels worked as a cashier for three different organizations, including: an electronic store from March 1990 until January 1992, a casino from February 1992 until April 1994, and a currency exchange company from April 1994 until June 1996 (R. 129). From June 1996 until September 2001, Ms. Daniels held a job as a card dealer at a casino where she helped customers with their card games, customer service questions, and money exchanges (R. 129, 133).

Following that job, Ms. Daniels worked as a resident care assistant at an assisted living facility from October 2001 until June 2003 (R. 129). Ms. Daniels assisted the residents with their daily care needs, including helping them bathe and eat, wash their clothes, and prepare their food. Ms. Daniels also assisted residents with their medications, and she lifted residents into their beds or chairs, off the toilet, and in and out of the shower (R. 129, 132). Next, from March 2003 through May 2004, Ms. Daniels held a position in production at a warehouse where she lifted and packed products into boxes on a conveyer belt (R. 129, 131). Ms. Daniels was also in charge of operating a forklift to load the packaged shipments onto trucks (R. 131). Finally, from June 2004 until June 2005, Ms. Daniels worked as a bus driver (R. 129). Part of her job entailed lifting children into their seats and helping them buckle their seatbelts (R. 130). Ms. Daniels testified that, in June 2005, she went back to school to become a Licensed Practical Nurse and has since completed her studies (R. 27-28, 30).

---

[3] A phlebotomist is a person who is trained in drawing blood. *Phlebotomist Definition*, DICTIONARY.COM, http://dictionary.reference.com/browse/phlebotomist (last visited Feb. 16, 2011).

On January 19, 2006, Ms. Daniels fractured her right hip in a motor vehicle accident (R. 56, 181, 202). In her application, Ms. Daniels claimed that the pain in her right leg and hip is so severe that she requires Vicodin every night to relieve the pain (R.156, 254). Ms. Daniels also noted that the pain and weaknesses from this injury prevent her from standing, walking, and sitting for long periods of time (R. 140). Ms. Daniels also claimed that, because she cannot put weight on her right leg, she has difficulty balancing, which requires her to use a walker or crutches and disables her from holding objects while she walks (R. 67, 139, 140).

Use of the walker or crutches also prevents Ms. Daniels from doing household chores by herself, including making her bed, grocery shopping, or picking up items from the ground (R. 140, 155). Ms. Daniels stated that she needs aid everywhere she goes, because she is afraid of falling as a result of the light-headed feeling that she sometimes experiences when she stands (R. 157). Moreover, Ms. Daniels noted that she cannot comfortably bend her leg, and she needs assistance when stepping in and out of the bathtub, as well as when dressing and bathing herself from the waist down (R. 139-140, 156, 168). Likewise, Ms. Daniels stated that she requires help getting out of bed, off of the sofa, up the stairs, and in and out of motor vehicles (R. 140). Ms. Daniels said that since the accident, she can no longer drive a car due to her broken right hip (*Id.*). Additionally, Ms. Daniels wrote that the accident made it difficult for her to take care of her disabled child, who requires her assistance for many daily activities, including showering and dressing (R. 141, 158).

In addition to the physical pain that she feels, Ms. Daniels noted that her condition angers and frustrates her (R. 157). For example, Ms. Daniels stated that sometimes gets angry and gets into arguments with others because she is frustrated that she is incapable of doing things that other people are capable of doing (*Id.*). Ms. Daniels noted that she occasionally yells at her children for no reason

4

(*Id.*). Furthermore, Ms. Daniels wrote that, "It[']s hard to concentrate on anything I'm doing or talking about with others because I become angry very easy and frustrated easy also. I can[']t think straight if someone is talking and the [television] is on, seems like I don[']t hear what people say the [first] time" (R. 156). Ms. Daniels wrote that her forgetfulness occasionally causes her to fail to recall conversations that she had that same day and results in her losing her keys because she cannot remember where she set them down (*Id.*).

## B.

After the accident on January 19, 2006, Ms. Daniels was taken to Silver Cross Hospital where Dr. William Farrell, who is part of the Parkview Orthopaedic Group, found that she suffered an acute displaced basilar neck fracture of her right hip (R. 186, 203). On January 20, 2006, Dr. Farrell performed open reduction[4] internal fixation[5] surgery with three screws to stabilize the fracture (R. 181, 183, 190). Dr. Farrell noted that Ms. Daniels "tolerated the procedure well," and he kept Ms. Daniels at bed rest for twenty-four hours, after which Ms. Daniels began physical therapy for walker ambulation (R. 181).

On January 31, 2006, Ms. Daniels had her first post-operation evaluation (R. 177). Dr. Farrell documented that Ms. Daniels had no complaints about pain, and that the physical exams and x-rays revealed that her hip was healing properly (*Id.*). At Ms. Daniels' second post operation examination, on February 28, 2006, Dr. Farrell wrote that:

---

[4]"Open reduction" surgery to realign a fractured bone. *Open Reduction Definition*, DICTIONARY.COM, http://dictionary.reference.com/browse/open+reduction (last visited Feb. 16, 2011).

[5]"Internal fixation" involves stabilizing the fractured bone pieces together using screws, wires, pins or plates. *Internal Fixation Definition*, DICTIONARY.COM, http://dictionary.reference.com/browse/internal+fixation (last visited Feb. 16, 2011).

[Ms. Daniels] has been nonweightbearing since the last visit. She still has soreness about the hip area, although she is very protective of it as recommended. She uses a walker . . . . Clinically she is somewhat guarded with respect to range of motion but she has no pain at nighttime. She has no significant pain with sitting . . . . Recommendation is to continue nonweightbearing, partial weightbearing toe touch only at most.

(R. 188).

On May 23, 2006, at her post-operation appointment four months after the surgery, Dr. Farrell noted that Ms. Daniels was "still experiencing pain about the [hip] region. It is not improving to her liking. Clinically, she is still experiencing pain with rotation. She can sit and sleep reasonably comfortably. It is the weightbearing that is the issue at stake" (R. 250). Dr. Farrell noted that the x-rays show "some varus angulation[6] at [the] fracture site. Minimal healing is seen . . . . Delayed healing baseline neck fracture right hip with varus angulation, maintenance of internal fixation and lack of adequate healing" (Id.). Dr. Farrell then recommended that Ms. Daniels have the screws removed and replaced with an uncemented bipolar prosthesis (Id.).[7]

Subsequently, Ms. Daniels consulted Dr. Michael D. Stover, who is an Assistant Professor of Pelvic and Acetabular Reconstruction in the Section of Orthopaedic Trauma at the Loyola University Health System, for a second opinion concerning her potential options moving forward (R. 253-254). On June 14, 2006, based on a bone scan, Dr. Stover determined that Ms. Daniels had a right "femoral neck nonunion with [a] viable femoral head" (R. 253). Dr. Stover noted that Ms. Daniels had "no new bone formation [and t]here is a loss of bone in the trochanteric area" (R. 295). He recommended that she undergo an "intertrochanteric valgus osteotomy with removal of

---

[6]"Varus angulation" is an abnormal angle of a bone. *Varus Definition*, DICTIONARY.COM, http://dictionary.reference.com/browse/varus (last visited Feb. 16, 2011).

[7]A prosthesis is an implanted device that replaces the defected or missing section of the bone. *Prosthesis Definition*, DICTIONARY.COM, http://dictionary.reference.com/browse/prosthesis (last visited Feb. 16, 2011).

hardware" (R. 253).[8] On October 27, 2006, Dr. Stover completed a seemingly successful surgery on Ms. Daniels; upon discharge on October 31, 2006, she denied having pain (R. 279-283).

Subsequent visits to Dr. Stover indicated initial improvement in Ms. Daniels' condition (R. 277-279). In February 2007, Dr. Stover reported increased flexion and that Mr. Daniels was "feeling better although not completely improved" (R. 277). In August 2007, Dr. Stover reported that Ms. Daniels had "100 degrees of flexion[, n]o pain with general rotation or log roll" (R. 276). Dr. Stover also reported that Ms. Daniels was able to walk without crutches, albeit with a limp (*Id.*). However, Dr. Stover noted Ms. Daniels still had pain and weakness in the hip, could not lay on that side, and could not do a straight leg raise (*Id.*). Dr. Stover stated that there was "little evidence of healing across the femoral neck," and that further surgery might be in order (*Id.*).

On September 13, 2007, Dr. Stover wrote that Ms. Daniels continued to experience pain, although the use of a cane "definitely decreases her symptoms" (R. 275). Dr. Stover stated that the radiographs displayed "slight subluxation[9] of the head" (*Id.*). Dr. Stover observed: "I think she would benefit from another attempt at the reconstruction . . . . I am concerned that the blade is getting very close to cutting at the front and may be one of the issues associated with the subluxation" (*Id.*). Dr. Stover also recommended to Ms. Daniels that she undergo another surgery sooner rather than later, but Ms. Daniels told him that she had other obligations to uphold before the surgery (*Id.*). It appears that by the time of the hearing, Ms. Daniels had not yet undergone the third

---

[8]This procedure involves removing the screws and dividing the bone at the femur. *Trochanters Definition*, DICTIONARY.COM, http://dictionary.reference.com/browse/trocdhanters+ (last visited Feb. 16, 2011); *Intertrochanteric Definition*, DICTIONARY.COM, http://dictionary.reference.com/browse/intertrochanteric (last visited Feb. 16, 2011); *Osteotomy Definition*, DICTIONARY.COM, http://dictionary.reference.com/browse/osteotomy (last visited Feb. 16, 2011).

[9]"Partial subluxation" is the partial dislocation of the joint. *Subluxation Definition*, DICTIONARY.COM, http://dictionary.reference.com/browse/subluxation (last visited Feb. 16, 2011).

surgery, since she testified that she continues seeing Dr. Stover about once every other month to discuss any changes in her condition and plans for an additional surgery (R. 32).

## C.

At the hearing on April 8, 2008, the ALJ heard testimony from Ms. Daniels, her cousin, and the vocational expert as summarized below.

### 1.

We begin our review with Ms. Daniels' testimony. Ms. Daniels testified that, since the accident when she broke her right hip, she feels severe pain where the plate was surgically placed in her leg and where her right hip bone rubs against her pelvic bone (R. 31). Ms. Daniels testified that 65 percent of the day, the pain is "like somebody's squeezing or tightening or twisting, and then it goes and then it's a sharp pain that shoots straight down to the knee" (R. 44). Also, the cramping she gets in her leg affects her ability to sit and stand for long periods of time and she gets sore after only five to ten minutes of walking and carrying things (R. 31). Ms. Daniels explained that she also has pain in her left knee and foot, as a result of overcompensation for her right leg that cannot support her (R. 43). Ms. Daniels testified that she only feels the pain in her left foot when she lies down at night: "it's a tightening but at the bottom of the foot, it just seems like somebody's hammering, you know, my foot" (R. 45).

Ms. Daniels testified that she began seeing Dr. Stover in June 2006 since she was not satisfied with the results of her first surgery with Dr. Farrell (R. 32-33). Ms. Daniels explained that after her second surgery that Dr. Stover performed in October 2006, she intended on continuing to see Dr. Stover once a month for follow-up consultations, but she only met with him approximately once every other month because she had difficulty getting to his office (R. 32). Ms. Daniels testified

8

that Dr. Stover restricted her from working and from engaging in any heavy lifting or strenuous work (R. 32-33). Ms. Daniels stated that after the second surgery, she was able to walk better than before, but now she feels pain because the plate is moving and the bones are rubbing against one another (R. 31, 34).

The ALJ then asked Ms. Daniels to describe a typical day in her life (R. 35). Ms. Daniels stated that on Mondays through Fridays, she wakes up around 7:00 a.m. to help her disabled son, Maury, get ready for school, but that she might remain in bed for a little longer on Saturdays and Sundays (*Id.*). Ms. Daniels explained that her son requires help bathing and dressing every morning because he is autistic, has diabetes, and is missing his left hand (R. 35-36). Ms. Daniels said that on Mondays through Fridays, the school bus picks her son up at 8:00 a.m., after which Ms. Daniels either lies back down, watches television, or reads a book (R. 36). Ms. Daniels stated that after the children leave for school, she either remains in bed or attempts to exercise her leg since it is stiff in the mornings (R. 37). Ms. Daniels testified that around 1:00 p.m. she tries to cook food for her children in preparation for their return home around 3:30 p.m. (R. 37-38).

Ms. Daniels further testified that when her children return home, she makes sure that they eat and clean up, and then she converses with them and helps them with their homework (R. 38). Other than seeing her children, Ms. Daniels testified that she sees her mother about once a week (R. 41). She is not involved in any social organizations, but she stated that she has no problem getting along with people (R. 42). Ms. Daniels said that her children carry the laundry upstairs, wash the dishes, vacuum, and sweep since she cannot do those chores by herself (R. 39). Ms. Daniels explained that she thought that she could lift a gallon of milk, which is about eight pounds, but she could not lift much more than that (R. 45-46). Ms. Daniels described her limitations and stated, for

9

example, that she can dress herself, but she cannot put on her socks and shoes on her own; she also can bathe herself, but she cannot wash her feet without assistance (R. 39). Ms. Daniels said that at about 6:00 p.m. she leaves her children and returns to her bedroom to watch television (R. 38). However, Ms. Daniels stated that she does not go to sleep until about 2:00 or 3:00 a.m. (*Id.*). Ms. Daniels testified that the pain in her leg makes it difficult for her to sleep (R. 38-39).

When asked about her psychological impairments, Ms. Daniels stated that she cannot sleep, and, when she is around other people, her depression and anxiety make her cry often. Ms. Daniels testified that she does not want to be so dependent on others (R. 40). To help herself, Ms. Daniels goes to the Will County Health Department where she sees a counselor once a month for an hour and a psychiatrist once a month for twenty to thirty minutes (R. 40-41). Ms. Daniels' psychiatrist has prescribed Temazepam for sleep, Remeron for sleep,[10] Ativan for anxiety, and Lexapro for depression (R. 34, 41, 306). Although Ms. Daniels stated that she believes that the medications have helped her, she also stated that they make her very tired (R. 34-35). Ms. Daniels also mentioned that she has difficulty with concentration and recall when she takes these medications (R. 42).

**2.**

Next, Melissa Wilson ("Ms. Wilson"), a relative of Ms. Daniels, verified the accuracy of Ms. Daniels' testimony and testified that she thinks that Ms. Daniels: [o]vercompensates and she thinks she can do more than she actually does" (R. 49). For example, Ms. Wilson stated that she believes Ms. Daniels cannot sit in a car while driving or riding for no longer than 20-25 minutes without experiencing pain (R. 49).

---

[10]Although Ms. Daniels stated that she was prescribed Remeron for sleep, other sources have listed Remeron (Mirtazapine) as an antidepressant. *Mirtazapine Definition* THEFREEDICTIONARY.COM, http://medical-dictionary.com/thefreedictionary.com/mirtazapine (last viewed Mar. 4, 2011).

Finally, the vocational expert, Ed Pagella, (the "VE"), testified that, despite her condition, he believed there were jobs in the national economy suitable for Ms. Daniels (R. 51). The VE stated that Ms. Daniels could manage "[o]ccupations at the sedentary level of physical tolerance which [would] allow an individual to sit or stand at will throughout the course of the workday in which they would not have to lift up, only up to ten pounds on a[n] occasional basis throughout the course of the day" (*Id.*). The VE testified that such jobs included "a hand sorter, in which there'd be 920 occupations . . . a bench assembler . . . in which there'd be 1,600 occupations . . . [and] a charge account clerk, in which there'd be 1,100 positions" (R. 51-52). However, the ALJ then asked the VE whether Ms. Daniels could work any jobs if the ALJ found her testimony to be completely credible (R. 52-53). He was asked to take into account the fact that Ms. Daniels said she could walk only ten minutes every hour for about eight hours; stand for five minutes every hour for about eight hours; and sit for about twenty minutes every hour for eight hours. In other words, the VE was asked to offer an opinion on whether Ms. Daniels could work if she could not stand, walk, and sit for more than eight hours each day (R. 46-48, 52-53). The VE testified that if Ms. Daniels' testimony was completely credible, then there were no jobs appropriate for a person with her limitations (R. 52-53).

## D.

In his written opinion denying benefits, the ALJ summarized his sequential analysis at each step. He arrived at the conclusion that Ms. Daniels was not disabled according to the social security standards (R. 17).

At Step 1, the ALJ determined that through December 31, 2010, Ms. Daniels did meet the insured status requirements of the Social Security Act (R. 11). The ALJ also determined that Ms. Daniels did not engage in substantial gainful activity since the date of her accident on January 19, 2006, her claimed onset date of disability (*Id.*). At Step 2, the ALJ found that Ms. Daniels' arthritis and degenerative joint disease were "medically determinable impairments [that] cause significant limitations in the claimant's work related functioning and are, therefore, severe within the meaning of the Regulations" (*Id.*). The ALJ found that Ms. Daniels' physical impairments (the pain resulting from her surgeries considered in conjunction with her obesity) were severe, since they presented substantial limitation to her work related functioning (R. 11-12). At Step 3, the ALJ did not find that the limitations and impairments, considered individually or in combination, met or medically equaled the requirements for any of the impairments listed in Appendix 1, Subpart P, Regulation No. 4 (R. 12). The ALJ considered Ms. Daniels' hip pain and found that "the medical evidence of record fails to establish the claimant has a *Major dysfunction of a joint(s) (due to any cause)*" (*Id.*) (emphasis in original).

The ALJ found that Ms. Daniels retained the residual functional capacity ("RFC") to:

> perform the exertional and nonexertional requirements of sedentary work as defined in 20 CFR 404.1567(b) and 416.967(b), except that she is limited to lifting and/or carrying no more than 10 pounds, standing/walking for approximately 2 hours in an 8 hour workday, and sitting for at least 6 hours in an 8 hour workday, with a sit/stand option. It is reasonable to conclude that the claimant's obesity has the effect of aggravating her other medical conditions, specifically, her arthritis and degenerative joint disease. Thus, the effects of the claimant's obesity further support the residual functional capacity reached in this decision.

(*Id.*).

The ALJ also addressed the issue of Ms. Daniels' testimony that suggested more severe limitations than reflected in the RFC:

> I find that while the claimant undoubtedly may experience some pain, limitations, and restrictions from her impairments, the medical record in its entirety demonstrates that the claimant has no greater limitations in her ability to perform work activities than those reflected in the residual functional capacity reached in this decision.

> After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairment could reasonably be expected to produce the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the residual functional capacity assessment assessed herein.

(R. 15).

At Step 4, the ALJ considered Ms. Daniels' RFC finding to determine if she was capable of performing any past relevant work (*Id.*). The VE testified that someone with Ms. Daniels' "residual functional capacity, age, education, and work experience, would not possess the exertional/non-exertional requirements needed to return to her prior work" (R. 16). The ALJ found that based on Ms. Daniels' RFC and the VE's testimony regarding the RFC, Ms. Daniels could not perform any past relevant work (*Id.*). Then, at Step 5, the ALJ found that, based on of Ms. Daniels' "age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform" (*Id.*). In conclusion, the ALJ held that Ms. Daniels was not disabled according to the Social Security Act.

### III.

We begin our review of the Commissioner's determination by setting forth the governing legal standards. To establish a disability under the Act, a claimant must show an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental

13

impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). Substantial gainful activity includes work that a claimant did before the impairment and any other kind of gainful work generally available in significant numbers within the national economy. 42 U.S.C. § 423(d)(2)(A).

The social security regulations prescribe a sequential, five-part test for determining whether a claimant is disabled. *See* 20 C.F.R. § 404.1520(a)(4). Under this rule, the ALJ must consider: (1) whether the claimant is currently performing any "substantial gainful activity;" (2) whether the claimant's alleged impairment or combination of impairments is severe; (3) whether any of the claimant's impairments equals or exceeds any impairment listed in the regulations as being so severe as to prevent substantial gainful activity; (4) whether the claimant is unable to perform his or her past relevant work; and (5) whether the claimant is unable to perform any other work existing in significant numbers in the national economy. *See* 20 C.F.R. § 404.1520(a)(4); *see also Young v. Sec'y of Health and Human Services*, 957 F.2d 386, 389 (7th Cir. 1992). A finding of disability requires an affirmative answer at either Step 3 or Step 5. 20 C.F.R. § 404.1520(a)(4). A negative answer at any step other than Step 3 precludes a finding of disability. *Craft v. Astrue*, 539 F.3d 668, 674 (7th Cir. 2008); *Young*, 957 F.2d at 389. The claimant bears the burden of proof at Steps 1 through 4 in order to make a *prima facie* case of disability, after which the burden of proof shifts to the Commissioner at Step 5. *Young*, 957 F.2d at 389.

On review, a court may not decide facts anew, reweigh evidence, or substitute its own judgment for that of the ALJ. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). We uphold an ALJ's decision if it is supported by substantial evidence; that is, "such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion." *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009) (internal citations and quotations omitted). "Where conflicting evidence allows reasonable minds to differ," the responsibility for determining whether a claimant is disabled falls upon the Commissioner (or the ALJ), not the courts. *See Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990); *see also Stuckey v. Sullivan*, 881 F.2d 506, 509 (7th Cir. 1989) (the "ALJ has the authority to assess the medical evidence and give more weight to evidence he finds more credible"). The Court is limited to establishing whether the Commissioner's final decision is "supported by substantial evidence and [is] based on the proper legal criteria." *Ehrhart v. Sec'y of Health and Human Services*, 969 F.2d 534, 538 (7th Cir. 1992). A finding may be supported by substantial evidence even if a reviewing court might have reached a different conclusion. *See Delgado v. Bowen*, 782 F.2d 79, 83 (7th Cir. 1986) (per curiam).

Nonetheless, the Commissioner (or ALJ) is not entitled to unlimited judicial deference. Judicial review of an ALJ's decision is "deferential, it is not abject." *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010). The ALJ must consider all relevant evidence, and may not select and discuss only that evidence which favors his or her ultimate conclusion. *See Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009). While the ALJ is not mandated to address every piece of evidence or testimony presented, the Court "cannot uphold an administrative decision that fails to mention highly pertinent evidence, or that because of contradictions or missing premises fails to build a logical bridge between the facts of the case and the outcome." *Parker*, 597 F.3d at 921 (internal citations omitted); *Craft*, 539 F.3d at 676.

## IV.

In this case, the plaintiff contends that the ALJ's Step Two determination was incomplete; his Step Three, RFC and Step Five determinations were erroneous, and his credibility finding was patently wrong. Because our analysis of Step 2 is determinative, we begin – and end – our discussion there.

The threshold issue in this case is whether the ALJ failed to meet his duty of fully and fairly developing the record regarding Ms. Daniels' claimed impairments at the administrative hearing and, if so, whether that failure was harmless or whether it affected or had the potential to affect the outcome of the disability determination. As we explain below, the Court concludes that the ALJ did not meet his obligation to fully develop the record regarding Ms. Daniels' claimed psychological limitations. As we further explain, this failure was not harmless because it may have affected the ALJ's decision at Step Two and, consequently, all remaining steps of the sequential evaluation. If, in fact, Ms. Daniels suffers from depression and anxiety, as she testified at the hearing, it is possible that medical records not requested by the ALJ might show one or both conditions(s) to be severe at Step Two. Because the ALJ did not identify depression or anxiety as severe at Step Two, he did not address these claimed impairments at Step Three or as part of his RFC determination.

### A.

Every claimant has a right to be represented by legal counsel in an administrative hearing. 42 U.S.C. § 406; *Binion v. Shalala*, 13 F.3d 243, 245 (7th Cir. 1994). If a claimant appears at an administrative hearing without legal representation, then the ALJ must provide the claimant with an opportunity to postpone the hearing and seek counsel, or to provide legal assistance for the claimant (including the funds to pay for it) by appointment. *Thompson v. Sullivan*, 933 F.2d 581, 584 (7th Cir.

16

1991). Although the ALJ must inform the claimant of this right, the claimant does not have an obligation to exercise this right. *Binion*, 13 F.3d at 245; *Thompson,* 933 F.2d at 584. Instead, a claimant may choose to proceed with the administrative hearing without legal counsel

But, where a claimant elects to proceed without legal representation during the administrative hearing, the ALJ has an additional "special duty" to ensure that all the relevant facts come to light. *Thompson*, 933 F.2d at 585-86 (citing cases). "This duty arises from the Commissioner's regulatory obligation to develop a complete medical record before making a disability determination." *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996) (citing 20 C.F.R. § 404.1512(d-f)). To that end, the ALJ is required to "scrupulously and conscientiously [] probe into, inquire of, and explore for all the relevant facts." *Nelms v. Astrue*, 553 F.3d 1093, 1098 (7th Cir. 2009); *Thompson*, 933 F.2d at 585-586. In exercising this duty, "the ALJ does not act as counsel for [the] claimant, but as an examiner who thoroughly develops the facts." *Thompson*, 933 F.2d at 586.

### B.

In this case, the ALJ properly notified Ms. Daniels of her right to be represented by counsel at the administrative hearing, but Ms. Daniels opted to proceed on her own, without representation (R. 21-22). Given Ms. Daniels' choice to continue *pro se*, the ALJ had a heightened duty to fully develop the record in order to ensure that all facts of the case were properly uncovered. *See Thompson*, 933 F.2d at 585-86 (citing cases). It is this last obligation that Ms. Daniels claims was not fulfilled; and, we agree. The ALJ did not follow up on Ms. Daniels' testimony that she suffers from depression and anxiety and – at the time of the administrative hearing – was being treated by a psychiatrist who had issued prescription drugs for these conditions. The ALJ did not ask Ms. Daniels for copies of the prescription records. Nor did he ask Ms. Daniels the name of the

17

psychiatrist treating her who issued the prescriptions, or even how often or for how long Ms. Daniels had been receiving treatment for depression and anxiety.

To illustrate the point, we quote from a portion of Ms. Daniels' testimony:

ALJ:   Now what medications are you on right now?

Ms. Daniels:   I take [T]emazepam for sleep, Remeron for sleep, Ativan for anxiety[,] and Lexapro for depression.

ALJ:   Do you think they help you?

Ms. Daniels:   Yeah.

ALJ:   Okay. Do you have any side effects from the medications?

Ms. Daniels:   I just get tired a lot but –

ALJ:   From the medications, you mean?

Ms. Daniels:   Yeah, from right there.

                                    *    *    *

ALJ:   How much of the time do you think you're tired from the medication?

Ms. Daniels:   I sleep a lot so it could be –

ALJ:   Is it all the time or does it come and go?

Ms. Daniels:   I mean I sleep a lot, but I'm depressed sometimes, so.

ALJ:   So you're not sure?

Ms. Daniels:   No.

ALJ:   Is that fair?

Ms. Daniels: It's fair

(R. 34-35).

The ALJ inquired no further into the side effects of Ms. Daniels' medications, or for how long she had been taking them. Later in the testimony, the ALJ inquired about Ms. Daniels' psychological impairments:

ALJ: Okay. Let's talk about psychological impairments. You said you're taking medication for depression and anxiety. So you have depression and anxiety?

Ms. Daniels: Yes.

ALJ: Okay. Any other conditions besides that?

Ms. Daniels: Just can't sleep. That's why they give me the Temazepam to make me sleep more.

ALJ: How do you think your depression and anxiety would affect your ability to work?

Ms. Daniels: I don't know, I cry a lot when I be in front of people because I want [to] do more that, what other people are doing.

ALJ: So you don't like being around people?

Ms. Daniels: I do. I just want to do more.

ALJ: Okay. So you're a little frustrated?

Ms. Daniels: And not have to depend on, you know, other people.

ALJ: Do you get any treatment for your psychological –

Ms. Daniels: I go to the counselor once a month and a doctor once a month.

ALJ: Where do you go?

Ms. Daniels: Will County Health Department, Dr. Terry [phonetic] –

ALJ: When'd you start going to him, [INAUDIBLE]?

Ms. Daniels: In 2007, June 2007.

ALJ:   And you go to a counselor once a month, is that right?

Ms. Daniels:   Yes, and the doctor that prescribes the medication once a month also.

ALJ:   Okay. So that would be a psychiatrist, right?

Ms. Daniels:   Yes.

ALJ:   Now the appointments with the counselor, how long do they last?

Ms. Daniels:   An hour with the counselor and maybe 20, 30 minutes with the doctor.

ALJ:   Okay. Do [you] think that's helping you?

Ms. Daniels:   It's better, as far, I think I'm better.

ALJ:   Okay.

*   *   *

ALJ:   When you're out, say you're at the grocery store or appointments or going to Will County, do you have any problems getting along with people?

Ms. Daniels:   No.

ALJ:   Do you have any problems with concentration?

Ms. Daniels:   Sometimes.

ALJ:   Can you give me an --

Ms. Daniels:   Sometimes.

ALJ:   -- example when you had a problem?

Ms. Daniels:   Like if I'm trying to think of something, I can't think of it because something else might be distracting me or I might be thinking of something else.

ALJ:   All right. So you have a problem with recall?

Ms. Daniels:   Yeah.

ALJ:   Okay.

(R. 40-42)

The record is devoid of any evidence that the ALJ ever sought any medical evidence regarding Ms. Daniels' psychological condition or the effects it might have on her ability to work. In particular, there is no evidence that the ALJ requested any documentation from the Will County Health Department, the psychiatrist or the counselor.

## C.

At Step Two, the ALJ failed to address whether Ms. Daniels' mental impairments were severe. However, based on the testimony cited above, the ALJ had a duty to inquire further into Ms. Daniels' claimed psychological impairments. The ALJ is required to develop a "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [a claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. § 404.1545(a)(3). The ALJ never followed up on Ms. Daniels' testimony concerning her mental health condition.

Ms. Daniels' testimony created a duty on the part of the ALJ to do so. Ms. Daniels testified to regular treatment with two mental health professionals, specific medications prescribed for her condition, and effects of both the medications and the underlying condition. This was enough to trigger the duty of the ALJ, when dealing with an unrepresented party, to flesh out that evidence. Moreover, Ms. Daniels provided the name of the medical office where she received treatment. Ms. Daniels also provided the name of at least one of the mental health professionals who treated

21

her: while that name was not sufficiently captured by the audio recording to be fully transcribed, we presume the full name was available to the ALJ.

The ALJ's failure to fully develop the record created an evidentiary gap between Ms. Daniels' testimony at the hearing and the ALJ's conclusion. Ms. Daniels' testimony by itself was not adequate to determine whether her psychological impairments were sufficient alone or in conjunction with her physical limitations to establish a "severe" impairment at Step 2, let alone a "disability" at the remaining steps of the sequential evaluation. A person suffering from a mental health condition may not be the best judge of the extent to which that condition affects her. Medical evidence – which was available but which the ALJ did not pursue – was needed to fill in that gap.

For example, at Step 3, the ALJ determined that Ms. Daniels had no impairments or combination of impairments that met or medically equaled the requirements for any of the listed impairments in Appendix 1 (R. 12). However, since the ALJ did not properly develop the record concerning Ms. Daniels' mental health condition at Step 2, her possible psychological impairments were not considered in the analysis of Step 3.

The same error affected the ALJ's RFC determination that found that Ms. Daniels retained the RFC to:

> perform the exertional and nonexertional requirements of sedentary work as defined in 20 CFR 404.1567(b) and 416.967(b), except that she is limited to lifting and/or carrying no more than 10 pounds, standing/walking for approximately 2 hours in an 8 hour workday, and sitting for at least 6 hours in an 8 hour workday, with a sit/stand option.

(*Id.*). The RFC finding incorporates no limitations based on Ms. Daniels' mental health condition. Full development of the medical record may have shown that to be appropriate; perhaps the evidence from Ms. Daniels' mental health treaters (or from an agency examiner's determination of

22

Ms. Daniels' mental RFC) would show that her mental health condition would have no measurable impact on her ability to work. But, the ALJ's failure to develop the record on this score results in a lack of substantial evidence – on this record – to support that conclusion.

The ALJ was required to consider the impact of all of Ms. Daniels' impairments combined. *See* 20 C.F.R. § 404.1523; *see also Terry v. Astrue*, 580 F.3d at 477. Had Ms. Daniels' psychological impairments been fully developed and then considered in combination with her physical impairments, then the ALJ may have arrived at different conclusions at each step of the sequential analysis. As a result, the error at Step 2 in failing to develop the medical record concerning Ms. Daniels' mental health condition was not harmless. The Court thus finds that Ms. Daniels has satisfied her burden of showing prejudice from the ALJ's failure to fully and fairly develop the record.

We therefore reverse and remand the case to permit the ALJ the opportunity to fully develop the record concerning Ms. Daniels' mental health condition. We express no view as to what the result should be after further proceedings on remand. We also leave the ALJ with the freedom to revisit other aspects of the case, in light of any new evidence gathered.[11]

## CONCLUSION

For the reasons stated above, the plaintiff's motion to reverse the final decision of the Commissioner is granted (doc. # 30), and the Commissioner's request to affirm (doc. # 34) is denied.

---

[11]Because we remand based on the error we have found at Step 2, the Court expresses no view as to the other arguments that Ms. Daniels has raised. We leave it to the ALJ to consider the plaintiff's other objections while reviewing and developing the record.

This case is remanded for further administrative proceedings pursuant to sentence 4 of 42 U.S.C. § 405(g) and consistent with this opinion.

ENTER:

SIDNEY I. SCHENKIER
United States Magistrate Judge

Dated: March 10, 2011